**2023-1786, 2023-1871 and 2023-1893**

# United States Court of Appeals
# for the Federal Circuit

CLIFFORD A. LOWE, SPOTA LLC, fka Insite Solutions, LLC,

*Plaintiffs-Appellants,*

*v.*

SHIELDMARK, INC., CROWN EQUIPMENT CORPORATION,
ADVANCED PLASTICS, INC.,

*Defendants-Cross-Appellants.*

*Appeal from the United States District Court for
the Northern District of Ohio, in Case No. 1:19-cv-00748-JG
(Hon. James S. Gwin, Judge)*

## NON-CONFIDENTIAL BRIEF FOR
## DEFENDANTS-CROSS-APPELLANTS

JAMES F. MCCARTHY, III
HOWARD WERNOW
SAND, SEBOLT & WERNOW CO., LPA
4940 Munson Street NW, Suite 1100
Canton, Ohio 44718
(330) 244-1174
james.mccarthy@sswip.com
howard.wernow@sswip.com

DAVID J. SHEIKH
LEE SHEIKH & HAAN LLC
125 South Clark Street, Suite 1175
Chicago, Illinois 60603
(312) 982-0070
dsheikh@leesheikh.com

*Counsel for Defendants-Cross-Appellants*

SEPTEMBER 27, 2023

### U.S. Patent No. 10,214,664

1.     A floor marking tape adhered to a floor wherein the floor marking tape establishes a boundary on the floor; the combination comprising:

a floor having an uppermost surface; the uppermost surface of the floor configured to support personnel and equipment thereupon;

a floor marking tape having a body that has an upper surface and a lower surface; the lower surface facing the uppermost surface of the floor to which the floor marking tape is adhered such that the body of the floor marking tape is disposed above the uppermost surface of the floor;

the body of the floor marking tape having a longitudinal direction;

the body of the floor marking tape having first and second lateral edge portions disposed in the longitudinal direction; each of the first and second lateral edge portions having an upper surface and a lower surface;

each of the first and second lateral edge portions having a width defined in a direction perpendicular to the longitudinal direction;

the upper surface of each lateral edge portion comprising an extension of the upper surface of the body;

the lower surface of each lateral edge portion being a flat coplanar extension of the lower surface of the body;

the entire body of each lateral edge portion being tapered with the upper surface of the first lateral edge portion extending to the lower surface of the first lateral edge portion and the upper surface of the second lateral edge portion;

each of the first and second lateral edge portions having a maximum height that is less than its width; and

an adhesive securing the lower surface of the body to the uppermost surface of the floor to establish a boundary.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CONSOLIDATED</u> <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1786, 2023-1871, 2023-1893 |
| **Short Case Caption** | Lowe v. Shieldmark, Inc. |
| **Filing Party/Entity** | Shieldmark, Inc., Advanced Plastics, Inc., Crown Equipment Corporation |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/20/2023

Signature: /s/David J. Sheikh

Name: David J. Sheikh

i

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Shieldmark, Inc. | | |
| Advanced Plastics, Inc. | | |
| Crown Equipment Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Joseph A. Sebolt, Esq. Sand Sebolt & Wernow Co., LPA | | |
| Laura L. Beoglas, Esq. Sand, Sebolt & Wernow Co., LPA | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)     ☑ No     ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................ i

CONFIDENTIAL MATERIAL OMITTED ............................................ vii

TABLE OF AUTHORITIES ............................................................... viii

STATEMENT OF RELATED CASES ................................................... xv

JURISDICTIONAL STATEMENT ....................................................... xvi

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE ISSUES FOR CROSS APPEAL .......................... 2

COUNTERSTATEMENT OF THE CASE ............................................... 2

SUMMARY OF THE ARGUMENT ...................................................... 4

ARGUMENT ..................................................................................... 7

I.    LOWE AND INSITE NC RELINQUISHED ANY CONTINUING
INTEREST IN THE '664 PATENT ............................................. 7

    A.    The Integrated Assignment, License, and Asset
Purchase Agreement ...................................................... 8

        1.    The Assignment ...................................................... 9

        2.    The License ........................................................... 10

        3.    The Asset Purchase Agreement ............................... 11

        4.    InSite NC's purported license to Lowe .................... 12

    B.    The consequences of the agreements ............................... 12

II.    STANDARD OF REVIEW ........................................................ 13

III.   LOWE AND SPOTA RELINQUISHED STANDING TO
       ASSERT INFRINGEMENT OF THE '664 PATENT...................................14

       A.    Lowe relinquished standing, constitutional and statutory...................17

       B.    Spota relinquished standing, constitutional and statutory...................19

       C.    The broader context confirms the lack of standing............................21

       D.    A hunting license does not equate to standing....................................22

       E.    The claim for patent infringement is moot...........................................24

       F.    The addition of InSite DE could not have restored standing.............26

IV.    THE '664 PATENT IS INVALID AND THE DISTRICT COURT
       COULD GRANT SUMMARY JUDGMENT OF INVALIDITY...............30

       A.    Standard of Review ...............................................................................32

       B.    The asserted claims of the '664 patent are anticipated by the
             Dorenbusch patent.................................................................................33

             1.    Dorenbusch discloses the "extension" claim element .............34

             2.    Dorenbusch discloses the "limits unintentional lifting" claim
                   element ........................................................................................37

             3.    Lowe's new argument that Dorenbusch fails to disclose a
                   tape that is "secured" to the floor should be rejected ..............38

       C.    The '664 patent is invalid as anticipated by the prior art DuraStripe
             floor tape...............................................................................................41

V.     SHIELDMARK'S ADVERTISING WAS MERE PUFFERY.................43

       A.    Standard of Review ...............................................................................43

       B.    The false advertising claim ..................................................................43

       C.    The district court found the phrases to be mere puffery .....................44

       D.    The ads were puffery – not literally false statements of fact .............44

       E.    Spota has no proof of damages ............................................................47

v

VI.    JUDGE GWIN DISPLAYED NO BIAS OR PREJUDICE IN HIS
        INTRAJUDICIAL BEHAVIOR ...................................................48

        A.    Standard of Review .............................................................48

        B.    Principles of recusal ...........................................................48

        C.    Lowe's motion to recuse Judge Gwin ...................................52

        D.    Judge Gwin's alleged intrajudicial bias ...............................53

                1.    Judge Gwin's intrajudicial remarks ...........................53

                2.    Judge Gwin's intrajudical rulings ..............................54

VII.   LOWE AND SPOTA ENGAGED IN VEXATIOUS LITIGATION
        AND SANCTIONABLE CONDUCT WARRANTING AN
        AWARD OF FEES ....................................................................56

        A.    Standard of Review .............................................................56

        B.    The district court's findings of vexatious litigation .............56

        C.    Argument ...........................................................................57

        D.    The district court's findings of sanctionable conduct ..........62

VIII.  LOWE ENGAGED IN INEQUITABLE CONDUCT ..................................64

        A.    Standard of Review .............................................................64

        B.    Lowe failed to make material disclosures .............................64

        C.    Argument ...........................................................................66

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .............................68

## <u>CONFIDENTIAL MATERIAL OMITTED</u>

Pursuant to Federal Circuit Rule 28(d)(1)(B), material subject to the Protective Order in the underlying case has been redacted on page 11.  The omitted materials refer to confidential information of Appellants Clifford A. Lowe and Spota LLC, fka Insite Solutions, LLC regarding a sale of their business to a third party.

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC*,
  625 F.3d 1359 (Fed. Cir. 2010) ............................................................14

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,
  604 F.3d 1354 (Fed. Cir. 2010) ........................................................16, 19

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
  913 F.2d 958 (D.C. Cir. 1990) .............................................................47

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ................................................................14, 24, 25

*Altvater v. Freeman*,
  319 U.S. 359 (1943) ........................................................................30

*Andreade v. Chojnacki*,
  338 F.3d 448 (5th Cir. 2003) ........................................................50, 51, 52, 53

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) .............................................................25

*Arizonans for Off. Eng. v. Arizona*,
  520 U.S. 43 (1997) ........................................................................24

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*,
  204 F.3d 683 (6th Cir. 2000) ..............................................................47

*Baldwin Hardware Corp. v. FrankSu Enter. Corp.*,
  78 F.3d 550 (Fed. Cir. 1996) ..............................................................48

*Ball v. Coker*,
  168 F. 304 (C.C.D.S.C. 1909) .............................................................18

*Biden v. Texas*,
  ___ U.S. ___, 142 S. Ct. 2528 (2022) (Barrett, J dissenting)............................26

*California v. Texas*,
___ U.S. ___, 141 S. Ct. 2104 (2021) ................................................. 26

*Cardinal Chem. Co. v. Morton Int'l., Inc.*,
508 U.S. 83 (1993) .......................................................................... 31, 32

*Cargill, Inc. v. Canbra Foods, Ltd.*,
476 F.3d 1359 (Fed. Cir. 2007) ........................................................... 64

*In re Caveny*,
761 F.2d 671 (Fed. Cir. 1985) ............................................................. 42

*Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*,
150 F.3d 1354 (Fed. Cir. 1998) ........................................................... 40

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ............................................................................. 63

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988) ........................................................... 40

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
120 F.3d 1253 (Fed. Cir. 1997) ....................................................... 66, 67

*Crown Die & Tool Co. v. Nye Tool & Mach. Works*,
261 U.S. 24 (1923) ......................................................................... 18, 22

*Digital Control Inc. v. Charles Mach. Works*,
437 F.3d 1309 (Fed. Cir. 2006) ........................................................... 66

*Enzo APA & Son, Inc. v. Geapag A.G.*,
134 F.3d 1090 (Fed. Cir. 1998) ........................................................... 18

*ESIP Series 1, LLC v. Doterra Int'l, LLC*,
2022 WL 656777 (D. Utah Mar. 4, 2022), *reconsideration denied*,
2022 WL 17903397 (D. Utah Dec. 23, 2022) ...................................... 58

*Forcillo v. Lemond Fitness, Inc.*,
168 F. App'x 429 (Fed. Cir. 2006) ....................................................... 60

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
582 F.3d 1288 (Fed. Cir. 2009) ........................................................... 39

*Glaxo Grp. Ltd. v. TorPharm, Inc.*,
153 F.3d 1366 (Fed. Cir. 1998) ..................................................9, 32, 41

*Groden v. Random House, Inc.*,
61 F.3d 1045 (2nd Cir. 1995) ...............................................................45

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*,
222 F.3d 951 (Fed. Cir. 2000) ..............................................................35

*Impression Prod., Inc. v. Lexmark Int'l, Inc.*,
581 U.S. 360 (2017)...............................................................................15

*Innovation Ventures, LLC v. N.V.E., Inc.*,
694 F.3d 724 (6th Cir. 2012) ................................................................45

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*,
248 F.3d 1333 (Fed. Cir. 2001) ............................................................15

*IQ Prod. Co. v. Pennzoil Prod. Co.*,
305 F.3d 368 (5th Cir. 2002) ................................................................48

*Junker v. Med. Components, Inc.*,
25 F.4th 1027 (Fed. Cir. 2022) ......................................................32, 43

*Leggett & Platt, Inc. v. VUTEk, Inc.*,
537 F.3d 1349 (Fed. Cir. 2008) ............................................................40

*Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*,
606 F.3d 1353 (Fed. Cir. 2010) ............................................................56

*Lewis v. Cont'l Bank Corp.*,
494 U.S. 472 (1990)...............................................................................62

*Lexmark Intern., Inc. v. Static Control Corp.*,
572 U.S. 118 (2014)...............................................................................17

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988)...............................................................................49

*Liteky v. United States*
510 U.S. 540 (1994)..........................................................50, 51, 52, 55

*Lone Star Silicon Innovations, LLC v. Nanya Tech. Corp.*,
    925 F.3d 1225 (Fed. Cir. 2019) ................................................15, 16, 20

*Louisiana-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*,
    335 F. Supp. 3d 1002 (M.D. Tenn. 2018), *aff'd*, 928 F.3d 514
    (6th Cir. 2019) ......................................................................................45

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
    814 F.3d 1343 (Fed. Cir. 2016) ............................................................14

*McLaughlin v. Union Oil Co. of California*,
    869 F.2d 1039 (7th Cir. 1989) ..............................................................55

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)..............................................................................31

*Minnesota Mining & Mfg. Co. v.
    Johnson & Johnson Orthopedics, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992) ......................................................32, 33

*Morrow v. Microsoft Corp.*,
    499 F.3d 1332 (Fed. Cir. 2007) ......................................................15, 16

*Mynette Technologies, Inc. v. U.S.*,
    139 Fed. Cl. 336 (2018) ........................................................................28

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014)..................................................................56, 57, 60

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
    930 F.3d 519 (D.C. Cir. 2019) ..............................................................25

*Pac. Gas & Elec. Co. v. U.S.*,
    82 Fed. Cl. 474 (2008) ..........................................................................63

*Peters v. Active Mfg. Co.*,
    129 U.S. 530 (1889)..............................................................................36

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ................................................................46

*Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*,
    784 F.2d 674 (5th Cir. 1986) ..........................................................45, 46

xi

*Prima Tek II, LLC v. A-Roo Co.*,
 222 F.3d 1372 (Fed. Cir. 2000) ...................................................19, 22

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
 438 F.3d 1123 (Fed. Cir. 2006) ..............................................................66

*Rite-Hite Corp. v. Kelley Co.*,
 56 F.3d 1538 (Fed. Cir. 1995) (en banc) .............................................13

*SanDisk Corp. v. STMicroelectronics, Inc.*,
 480 F.3d 1372 (Fed. Cir. 2007) ..............................................................31

*Sicom Sys., Ltd. v. Agilent Techs., Inc.*,
 427 F.3d 971 (Fed. Cir. 2005) ...........................................................20, 28

*Southland Sod Farms v. Stover Seed Co.*,
 108 F.3d 1134 (9th Cir. 1997) .................................................................46

*Special Equip. Co. v. Coe*,
 324 U.S. 370 (1945).....................................................................................15

*Speedplay, Inc. v. Bebop, Inc.*,
 211 F.3d 1245 (Fed. Cir. 2000) ..............................................................20

*Spokeo, Inc. v. Robbins*,
 578 U.S. 330 (2016)..............................................................................14, 23

*TransUnion LLC v. Ramirez*,
 __ U.S. __, 141 S. Ct. 2190 (2021)...................................................16

*In re Triple S Restaurants, Inc.*,
 422 F.3d 405 (6th Cir. 2005) ...................................................................54

*TruCenter Gate Leasing, Inc. v. Sonoran Gate LLC*,
 402 F. Supp. 2d 1093 (D. Ariz. 2005) .................................................61

*U.S. v. Ayala*,
 289 F.3d 16 (1st Cir. 2002)................................................................50, 51

*U.S. v. Grinnell Corp.*,
 384 U.S. 563 (1966)..............................................................................50, 51

*U.S. v. Sammons,*
    918 F.2d 592 (6th Cir. 1990) ............................................................51

*U.S. v. Story,*
    716 F.2d 1088 (6th Cir. 1983) ......................................................50, 52

*U.S. v. Texas,*
    ___ U.S. ___, 143 S. Ct. 1964 (2023) (Gorsuch, J. concurring) ......................23

*Warth v. Seldin,*
    422 U.S. 490 (1975)....................................................................14

*Waterman v. Mackenzie,*
    138 U.S. 252 (1891).....................................................................27

*WiAV Sols. LLC v. Motorola, Inc.,*
    631 F.3d 1257 (Fed. Cir. 2010) ........................................................16

*Woodruff v. Tomlin,*
    593 F.2d 33 (6th Cir. 1979) ............................................................55

*Wysong Corp. v. APN Inc.,*
    889 F.3d 267 .............................................................................45

*Youn v. Track, Inc.,*
    324 F.3d 409 (6th Cir. 2003) ....................................................48, 49, 50

**State Cases**

*Ripley v. Int'l Rys. of Cent. Am.,*
    8 N.Y.2d 430, 171 N.E.2d 443 (1960)....................................................9

**Federal Statutes**

15 U.S.C. § 1117(a) .......................................................................47

15 U.S.C. § 1125(a)(1)(B) ................................................................45

28 U.S.C § 144 ...................................................................49, 50, 51, 52

28 U.S.C. § 455 .....................................................................*passim*

28 U.S.C. § 2201 ..........................................................................31

35 U.S.C. § 102(b) ................................................................42, 43

35 U.S.C. § 154(a)(1) ................................................................15

35 U.S.C. § 281 .....................................................................1, 16

35 U.S.C. § 285 ..................................................................*passim*

42 U.S.C. § 1988 ........................................................................62

Lanham Act § 43(a) ...................................................................44

**Rules**

Fed. R. Civ. P. 11 .....................................................................63

Fed. R. Civ. P. 37 .....................................................................63

Fed. R. Civ. P 26(e)(1)(A) .........................................................59

Local Patent Rule 1.5 ...............................................................55

Local Patent Rule 2.2 ...........................................................62, 63

**Other Authorities**

Charles G. Geyh, *Judicial Disqualification: An Analysis of Federal Law, Third Edition* (3d ed. 2020) ...............................................48, 49

## <u>STATEMENT OF RELATED CASES</u>

Appellants Clifford A. Lowe and Spota LLC, fka Insite Solutions, LLC, filed two prior appeals in this case. The first was Appeal No. 2021-2164. On March 4, 2022, the court issued a nonprecedential opinion that vacated the district court's decision granting summary judgment of noninfringement and remanded for further proceedings and affirmed the dismissal of Appellants' declaratory judgment claim and denial of attorney fees. In Appeal No. 2022-2273, on November 28, 2022, the Court issued a nonprecedential order that dismissed Appellants' appeal for lack of subject matter jurisdiction.

## JURISDICTIONAL STATEMENT

ShieldMark agrees with the jurisdictional statement provided by Lowe with respect to the district court decisions that Lowe has appealed. ShieldMark provides a jurisdictional statement for its cross-appeal.

The district court had jurisdiction over ShieldMark's Counterclaim – Count Three for a declaratory judgment that the '664 patent is unenforceable based on inequitable conduct in the PTO under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. After dismissing Lowe's claims for infringement of the '664 patent, the district court retained jurisdiction to decide ShieldMark's motion for attorney fees under 35 U.S.C. § 285 and to make findings of inequitable conduct in connection with that motion. *See Monsanto Co. v Bayer Biosciences N.V.*, 514 F.3d 1229, 1242-43 (Fed. Cir. 2008). ShieldMark filed a notice of cross-appeal of the district court's denial of ShieldMark's motion for attorney fees on May 2, 2023. That cross-appeal was docketed as Appeal No. 2023-1893, but was subsequently consolidated with Lowe's Appeal Nos. 23-1786 and 23-1871. This Court has jurisdiction over ShieldMark's cross-appeal from the district court's denial of the motion for attorney fees under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

Appellees ShieldMark, Inc., Advanced Plastics and Crown Corp. (collectively "ShieldMark") disagree with some of the issues Appellants Clifford A. Lowe ("Lowe") and Spota LLC ("Spota") have presented. Therefore, ShieldMark provides this counterstatement of nonagreed issues.

Did the district court err in finding that Lowe lost standing when he assigned all right, title and interest, including any causes of action, in U.S. Patent No. 10,214,664 (the "'664 patent") to Appellant InSite Solutions LLC (which subsequently changed its name to Spota) but claimed to have received back an oral license to continue the litigation to recover past damages without proof of the existence of such a license?

Did the district court err in finding that Spota lost standing when it relinquished all substantial interests in the '664 patent in the sale of its business and retained only a hunting license (a claim for past damages)?

Did the district court err in finding that neither Lowe nor Spota was a "patentee" or "assignee" under 35 U.S.C. §281?

Did the district court err in finding that standing for either Lowe or Spota could not be restored with the joinder of a non-exclusive licensee of the patent?

Did the district court err in granting summary judgment to ShieldMark, finding the '664 patent invalid based on a counterclaim for declaratory judgment?

1

Did the district court err in finding that ShieldMark's advertisements for its Mighty Line® floor marking tape were mere puffery and not literal factual equivalents of a '664 patent claim?

Did the district court abuse its discretion in finding this case to be "exceptional" and awarding ShieldMark a portion of its attorney fees under 35 U.S.C. § 285 considering the totality of the circumstances, including false allegations of fact, deliberately withholding documents sought in discovery, and willfully disclosing confidential information?

Did the district court abuse its discretion in denying Lowe' motion to recuse based strictly on alleged intrajudicial remarks and rulings?

## STATEMENT OF THE ISSUES FOR CROSS APPEAL

Did the district court err when it found that Lowe had not engaged in inequitable conduct before the PTO in prosecuting the '664 patent?

## COUNTERSTATEMENT OF THE CASE

Replete with irrelevant and at times confusing detail, Lowe and Spota failed to provide a concise statement of the case. To provide that concise statement, ShieldMark provides this brief counterstatement.

While this case was previously pending before this Court, Lowe and his company entered into a series of agreements resulting in the sale of the business. The sale was structured such that the assets of the company were transferred to the

buyer and Lowe and InSite NC were left with nothing more than a hunting license, i.e., a claim for past damages but the relinquishment of any substantial interest in the '664 patent and the consequent loss of standing. The district court concluded that because "… Lowe has kept no exclusionary rights in the … [p]atent, even if he did keep the right to prosecute this action, he does not have standing." Appx12. Likewise, the court found that InSite NC "gave up its patent enforcement rights." Appx14. Finally, the district court concluded that the standing deficiency could not be cured and dismissed the patent infringement claim with prejudice. Appx14-15.

The loss of standing did not deprive the district court of jurisdiction to decide ShieldMark's invalidity counterclaim or Lowe's false advertising claim. The district court found that the '664 patent is invalid as anticipated by the prior-art Dorenbusch patent. Appx15-22. In a separate order, the district court concluded that the alleged false phrases, such as "take a beating" in ShieldMark's advertising were "too vague to be actionably false." Appx26-28. And those phrases do not become verifiably false when taking into account ShieldMark's admission that its tape unintentionally lifts because the phrases "do not directly describe a tape's ability to resist unintentional lifting." Appx28.

Having witnessed Lowe's exceptional litigation tactics, including false allegations of patent ownership, flouting discovery obligations, and violating local patent rules, the district court concluded that Lowe's "actions strongly support the

inference of bad faith and a finding of litigation misconduct." Appx38-39. The court found a direct connection between Lowe's conduct and the fees and costs that ShieldMark incurred in litigating from December 2021 onwards. Appx39.

Relying upon objectively neutral intrajudicial rulings and comments, Lowe moved to recuse the district judge. Yet none of the intrajudicial rulings or comments betrayed a prejudice warranting the extreme remedy of recusal. Appx1-3.

The district court did make one error. In the face of repeated inculpatory descriptions of detailed submissions made during prosecution of the patent contradicting his actual sparse submissions – the court erred in finding that Lowe did not engage in inequitable conduct before the PTO in the prosecution of the '664 patent. Appx35-36.

## SUMMARY OF THE ARGUMENT

With the sale of his floor marker business, Lowe transferred all assets used in the business to InSite DE. The sale resulted in a substantial payment to Lowe, but also came with a price – the loss of standing to continue the patent infringement claim. The transaction eradicated any continuing interest either Lowe or Spota had in the '664 patent. Rather, they were left with a hunting license to pursue past damages instead of a right to vindicate the '664 patent. Recognizing that the patent infringement claim was now moot, the district court correctly concluded that neither Lowe nor Spota retained standing to continue the claim. The court similarly

concluded that the addition of InSite DE could not restore standing because InSite DE emerged from the transaction as a non-exclusive licensee, lacking ownership or any other substantial rights in the '664 patent.

But the sale of the business and the consequent loss of standing did not deprive the district court of jurisdiction to adjudicate the invalidity of the '664 patent. ShieldMark's counterclaim presented a viable dispute warranting resolution -- a resolution that this Court can and should review. The prior-art Dorenbusch patent indisputably discloses every element of the asserted claims of the '664 patent and, therefore, the district court's grant of summary judgment that the '664 patent is invalid as anticipated by Dorenbusch should be affirmed. The record also dictates that the '664 patent is anticipated by the prior-art DuraStripe floor tape. Although the district court did not address DuraStripe in its summary judgment decision, DuraStripe was fully presented to the district court. Therefore, even if the '664 patent is not invalid based on Dorenbusch, this Court could affirm summary judgment of invalidity based on DuraStripe.

Pled in the alternative to patent infringement, Spota alleged that ShieldMark made literally false representations of fact in its advertisements for Mighty Line® floor tape. But the cherry-picked phrases from the advertising were actually bald assertions of superiority or general statements of opinion – puffery. None of the phrases can be adjudged true or false in a way that admits of empirical verification.

The district court correctly granted summary judgment to ShieldMark.

The Supreme Court was blunt that §285 is "patently clear" in imposing only one constraint on a district court's discretion to award attorney fees. The power is reserved for "exceptional" cases. The bar for what constitutes "exceptional" conduct is conduct that "simply stands out from others." The district court witnessed first-hand the exceptional conduct to which Lowe and Spota resorted. False allegations of fact, failure to adhere to discovery obligations, withholding of discovery, and disclosure of confidential information were rampant. The district court correctly found that ShieldMark was entitled to an award of attorney fees.

With each of his intrajudicial comments and rulings, Judge Gwin adhered to the exceptional standard expected of federal judges. He may have expressed frustration or impatience but at no time did he display any scintilla of bias or prejudice warranting recusal. His denial of Lowe's motion for recusal should be affirmed.

While the district court consistently applied the law to the facts, it did commit one error. In its final decision, the district court found that Lowe had not engaged in inequitable conduct during the prosecution of the '664 patent.  That conclusion ignores the deceptiveness of the sparse disclosure made to the patent examiner, particularly when compared to the inculpatory admissions made during this litigation. Giving due consideration to the admissions made in this case, the court

should have found that Lowe had deliberately withheld material information from and deceived the patent examiner and, but for Lowe's improper conduct, the '664 patent would not have been granted. That one decision should be reversed and remanded for further consideration.

## ARGUMENT

## I.   LOWE AND INSITE NC RELINQUISHED ANY CONTINUING INTEREST IN THE '664 PATENT[1]

While this case was previously pending before this Court, Lowe and InSite NC entered into a series of agreements resulting in the sale of InSite NC's business. The language of those agreements relinquished any continuing interest Lowe and InSite NC had in the '664 patent. That lack of interest eradicated any standing either Lowe or InSite NC/Spota had to continue their alleged infringement claims against ShieldMark. In the words of the district court: "Because… Lowe and InSite [NC] … do not have this patent's exclusionary rights, they lack standing to continue this three-year-old patent infringement case …" Appx4-5.

The consequences for standing arose from the entire transaction, not from a single transactional document, such as an assignment or a license.  Lowe sold all the assets used in the business. Lowe's company ceased operations and agreed not to

---

[1] InSite NC changed its name to Spota as part of the sale of the business. ShieldMark will refer to the limited liability company either as Spota or InSite NC depending on the context to ensure factual accuracy.

engage in a competing business manufacturing and selling floor marking tape. The duration of the restrictive covenant mirrored the '664 Patent, which expires on May 9, 2026. Lowe and Insite effectively abandoned the patent.

Lowe and Insite NC concealed the transaction in an effort to avoid ramifications for this litigation. Six months after the transaction, Lowe and Insite NC filed a Fourth Amended Complaint, falsely alleging: "Lowe is the owner of all rights, title and interest in and to the '664 Patent. Insite [NC] is an exclusive licensee under the '664 patent engaged in the manufacture, distribution, and sales of floor marking tape pursuant to its license under the name 'Superior Mark'." Appx1185. Furthering the deception, Lowe withheld disclosure of the transaction from discovery.

## A. The Integrated Assignment, License, and Asset Purchase Agreement

Lowe and Spota isolate each agreement making up the sale of the business, suggesting that each is unrelated to the others. They then argue that the intent of the parties should be discerned from each agreement in isolation and without reference to the others. However, each agreement is an integral part of the entire transaction. For example, the Patent License Agreement provides: "This Agreement, along with the Purchase Agreement and other agreements contemplated thereby, embodies the entire understanding of the Parties with respect to the subject matter of this Agreement, and merges all prior discussions between them, and neither of the Parties

8

will be bound by any conditions, definitions, warranties, understandings or representations with respect to the subject matter of this Agreement other than as expressly provided in this Agreement or in the Purchase Agreement or other agreement contemplated thereby." Appx1813. Because the Assignment and the License are conditions to closing the entire transaction and are integral parts of the sale, the Court should also consider the Asset Purchase Agreement to discern the parties' intent. *See Ripley v. Int'l Rys. of Cent. Am.,* 8 N.Y.2d 430, 438, 171 N.E.2d 443, 446 (1960).[2]

### 1.    The Assignment

The transaction began with Lowe's assignment of the '664 patent to InSite NC. Effective December 9, 2021, Lowe entered into a Patent Rights Assignment with InSite NC (the "Assignment"). Appx1803-1806. "[T]he execution and delivery of this Assignment [was] … a condition to Closing under the Purchase Agreement." Appx1803.  Lowe assigned to InSite NC his "… entire right, title and interest in and throughout the world in and to …" the inventions described and/or claimed in the '664 patent together with his "… entire right, title and interest in and to …" the '664

---

[2] Although the district court did not expressly rely on the Asset Purchase Agreement in its Opinion & Order dismissing Lowe and Spota's patent infringement claim, this Court can consider and rely on that agreement to affirm the district court's judgment because that document is part of the district court record. *See Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1371-72 (Fed. Cir. 1998).

patent and such other patents as may issue thereon or claim priority under United States law or international convention. Appx1803. Lowe also transferred to InSite NC all rights to the protections of the inventions and rights arising under United States law and international treaties, including "any cause(s) of action or damages accruing prior to the assignment." *Id*. Effective December 9, 2021, Lowe had no rights in the '664 patent, or any causes of action, past, present, or future, for infringement of the patent.

## 2.    The License

One week later, InSite NC entered into a Patent License Agreement (the "License") with InSite Solutions, LLC, a Delaware limited liability company ("InSite DE"). Appx1808-1816. Like the Assignment, the License was "… a condition for closing the transactions contemplated by the Purchase Agreement." Appx1808.  InSite NC granted to InSite DE a world-wide, fully transferable, fully sublicensable, royalty-free, fully paid-up, perpetual, irrevocable, and non-terminable license to practice any methods or inventions claimed by the '664 patent and to make, use, sell and otherwise distribute, offer to sell, or import or export any technology, products or services described by the '664 patent. Appx1809 at §2.1. InSite NC also gave InSite DE the exclusive option to acquire the '664 patent at no additional cost. The exercise of that option was postponed until InSite NC gave notice that this litigation would not be pursued to resolution or until three months

following entry of a final judgment and exhaustion of appeals in the litigation. Appx1809-1810 at §§1.3, 1.4, 2.2. If InSite DE exercised the option, InSite NC agreed to give InSite DE all causes of action, whether known or unknown or whether currently pending filed, or otherwise. Appx1809-1810 at §2.2.

One "reservation" was included in the License. InSite DE acknowledged that Lowe and InSite NC retained the exclusive right to recover damages for infringement of the '664 patent *prior* to the effective date of the agreement, December 16, 2021. Appx1810 at §2.3 (emphasis added). Conspicuously absent was any right of any party to seek relief for alleged infringement of the '664 patent by ShieldMark, Advanced Plastics, or Crown Corp. based on their activities after December 16, 2021.

### 3.    The Asset Purchase Agreement

As of December 16, 2021, InSite DE purchased and acquired from InSite NC all assets of every kind used in the business. Appx2734-2867. In consideration for the assets of the business, InSite DE agreed to pay Lowe the sum of dollar amount . Appx2739.

In accordance with the Asset Purchase Agreement, Lowe also gave InSite DE a Restrictive Covenant Agreement in which Lowe agreed for a period of number years from the closing date that neither he nor his company would manufacture or sell floor markers or floor tape. Appx2812 at §2(a). The Restrictive Covenant Agreement

provided additional restrictions to protect Insite DE's business investment. *Id*. at §2(b)-(g). Of note, the duration of the restrictive covenant paralleled the term of the '664 patent, which expires on May 9, 2026. As of the closing date, neither Spota nor Lowe were in the business of manufacturing or selling floor marking tapes. And neither retained any right to practice the invention or technology of the '664 patent.

### 4.    InSite NC's purported license to Lowe

Without any supporting documentation of the terms, conditions or even the date, Lowe claimed that InSite NC granted him an exclusive oral license to maintain, control and settle this lawsuit. Dkt. 23 at 5. As the district court found:

> Lowe has not presented adequate evidence that an exclusive license agreement exists. He does not even affirmatively allege there was an oral exclusive license agreement. Lowe says that the InSite North Carolina-InSite Delaware agreement references Lowe's exclusive license, but it only references Lowe's purported ability to control this litigation, which is different from an exclusive license.

(Appx11).

Additionally, the court found that the alleged grant of a license to Lowe conflicted with the license to InSite DE. That finding, the court concluded, "… supports the Court's finding that Lowe's exclusive license agreement does not exist or Plaintiffs' failed to sufficiently establish it to meet their burden here." Appx11.

### B.    The consequences of the agreements

With the execution of these integrated agreements, Lowe and InSite NC fundamentally altered the rights in the '664 patent. Lowe relinquished all rights, title,

and interest in the '664 patent and transferred those rights to InSite NC, including any causes of action for infringement, past or future. However, the InSite NC rights were short-lived. Within days, Lowe and InSite NC sold their floor marking business to InSite DE. Under the terms of the agreements, no one, not Lowe, not Spota, and not InSite DE, has the extant right to enforce the '664 patent, including the ability to pursue damages or injunctive relief after December 16, 2021. The obligations under the agreements eradicated any rights that Lowe and Spota had in the '664 patent. Neither Lowe nor Spota can manufacture, distribute or sell any floor marking tape. Neither Lowe nor Spota can license the '664 patent to anyone other than InSite DE. InSite DE is equally cabined. InSite DE is a non-exclusive licensee with no right to enforce the '664 patent. The consequence of the transactional agreements is that there is a vacuum in the enforcement of the '664 patent. Effective December 16, 2021, Lowe and Spota no longer held any existing rights in the '664 patent. As a result, the district court dismissed the patent infringement claims with prejudice for lack of standing. Appx4-23.

## II.    STANDARD OF REVIEW

The Court reviews decisions regarding standing to sue de novo. *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc). "To the extent [any] *jurisdictional* facts are in dispute, however, the findings of fact are reviewed

for clear error." *Abraxis Bioscience, Inc. v. Navinta LLC,* 625 F.3d 1359, 1363 (Fed. Cir. 2010) (alteration in original). The district court's interpretation of an unambiguous contract is a question of law reviewed de novo. *Luminara Worldwide, LLC v. Liown Elecs. Co.,* 814 F.3d 1343, 1347 (Fed. Cir. 2016).

## III.   LOWE AND SPOTA RELINQUISHED STANDING TO ASSERT INFRINGEMENT OF THE '664 PATENT

"Article III of the constitution limits the judicial role in our system of government to the resolution of 'cases' and 'controversies.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). The standing inquiry enforces this constitutional restriction on the power of the courts. "That limitation requires those who invoke the power of a federal court to demonstrate standing -- a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Id*. at 90–91 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

"Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, *** it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing...'." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citations omitted); *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 341 (2016) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy…."). Essentially, the standing question in such cases is whether the constitutional or

14

statutory provision on which the claim rests can be understood as granting persons in the plaintiff's position a right to judicial relief. *Id*. The right to judicial relief is dependent upon the ability of the court to grant complete redress through trial.

"Since the patent statutes give rise to the right to sue others for patent infringement, they also define the nature and source of the infringement claim and determine the party that is entitled to judicial relief." *Morrow v. Microsoft Corp.,* 499 F.3d 1332, 1339 (Fed. Cir. 2007) (quotation omitted). Article III constitutional standing to assert patent infringement as an injury in fact and to seek redress, therefore, is dependent upon the patent statute identifying that right to sue.

Patent rights are, by definition, rights to exclude. 35 U.S.C. §154(a)(1) "The right to use, sell, or import an item exists independently of the Patent Act. What a patent adds ... is a limited right to prevent others from engaging in those practices." *Impression Prod., Inc. v. Lexmark Int'l, Inc.,* 581 U.S. 360, 374 (2017); *see Special Equip. Co. v. Coe,* 324 U.S. 370, 378 (1945) ("The patent grant is not of a right to the patentee to use the invention, for that [it] already possesses. It is a grant of the right to exclude others from [using] it."). "A party ... that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention." *Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.,* 248 F.3d 1333, 1346 (Fed. Cir. 2001); *Lone Star Silicon Innovations, LLC v. Nanya Tech.*

*Corp.,* 925 F.3d 1225, 1234 (Fed. Cir. 2019) ("[T]hose who possess 'exclusionary rights' in a patent suffer an injury when their rights are infringed."). Thus, "the touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer a legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010).

The inventor initially holds all rights but may convey some or all of those rights through transfers, assignments, and licenses. *Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.,* 604 F.3d 1354, 1360 (Fed. Cir. 2010). And "[w]hile parties are free to assign some or all patent rights as they see fit ..., this does not mean that the chosen method of division will satisfy standing requirements." *Morrow,* 499 F.3d at 1341 n.8.

This Court has clarified its precedent treating 35 U.S.C. §281 as a jurisdictional requirement. "[W]hether a party possesses all substantial rights in a patent does not implicate [constitutional] standing or subject-matter jurisdiction." *Lone Star*, 925 F.3d at 1235-36. While a party may not be required to possess all substantial rights in a patent (the definition of a patentee or assignee) to assert constitutional standing, a party must still assert a concrete injury. *See TransUnion LLC v Ramirez*, __ U.S. __, 141 S. Ct. 2190, 2204 (2021). The touchstone of a concrete injury for constitutional standing in a patent infringement case can only be

16

established if a party has ***an*** existing exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury. Requiring at least an existing exclusionary interest would preclude conflating statutory requirements (a patentee or assignee with "substantial interests") with standing requirements (a particularized concrete injury).

### A.    Lowe relinquished standing, constitutional and statutory[3]

Effective December 9, 2021, Lowe assigned to InSite NC all right, title, and interest in to the '664 patent "as fully and entirely as the same would have been held" by him.  Further, Lowe assigned "any cause(s) of action and damages accruing prior to" the assignment. Appx1803. With this assignment, Lowe relinquished all standing.

Lowe claims that Spota subsequently granted him an exclusive oral license and he reacquired standing. Lowe attributes this resurrected right to one sentence of the License. "Buyer acknowledges and agrees that Lowe, as owner, and Company [Insite NC] as exclusive licensee, of the Licensed Patents ***prior to the Effective Date,***

---

[3] Lowe argues both constitutional and "prudential" standing. However, "'prudential standing' is a misnomer … which asks whether this particular class of persons ha[s] a right to sue under this substantive statute. *Lexmark Intern., Inc. v. Static Control Corp.*, 572 U.S. 118, 127(2014) (internal quotations and citation omitted).

17

retain the exclusive rights to elect to maintain, control, and settle the ShieldMark Litigation." Appx1810 (emphasis added).

But "Lowe has not presented adequate evidence that an exclusive license exists." Appx11. Even the language itself confirms that Lowe no longer has any continuing "exclusive right" in the '664 patent. ("Lowe, as owner, …of the Licensed Patent prior to the Effective Date …"). Note that the language references the prior, not current, status as owner or licensee. Those rights had been relinquished.

This Court has been clear that a license must be in writing for the supposed licensee to assert standing. *Enzo APA & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090, 1093 (Fed. Cir. 1998). Lowe, however, provided no evidence of such a writing. The single sentence in the License is not evidence of a license but a reference to an ability to control this litigation – a hunting license. Appx10.

A hunting license is not a basis to assert standing. The court in *Ball v. Coker,* 168 F. 304, 308 (C.C.D.S.C. 1909), could not be more clear: "Profits or damages for infringement cannot be sued for … on the basis merely of the assignment of a right to a claim for damages severed from such title." *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 42 (1923). This Court has reaffirmed that a claim for patent infringement cannot be premised a mere *pro forma* assignment of patent rights for the purpose of pursuing litigation. "To hold otherwise would be to allow a patent owner to effectively grant a 'hunting license,' solely for the purpose of litigation, in

the form of a *pro forma* exclusive license …. The Supreme Court long ago disapproved of such arrangements." *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000).

Even Lowe's hunting license is limited. Lowe has conceded that any claim for damages is confined to past damages. Lowe ***admits*** that "the only period of time for which damages are being sought is that period of time beginning with the issue date of the '664 patent (February 26, 2019) through December 15, 2021, as expressly acknowledged in the Patent License Agreement … having an Effective Date of December 16, 2021." Appx1693.  Again, Lowe conceded: "InSite NC, along with Lowe and InSite DE, has agreed not to sue ShieldMark or other third parties for infringement of the '664 patent occurring after December 26, 2021…." Appx2705.

## B.    Spota relinquished standing, constitutional and statutory

Although Spota holds nominal title in the '664 patent, the company effectively relinquished all substantial rights in the patent. Not even the gratuitous, "the exclusive right to elect to maintain, control, and settle the ShieldMark Litigation," could vest continuing standing in Spota. Relying upon *Alfred E. Mann, supra.*, Spota argues that it retained the right to sue infringers which precludes a finding that all substantial rights were relinquished. Unlike Alfred E. Mann, who had a broad right to sue any accused infringer once the licensee declined to exercise its right to sue, Spota had no such uninhibited right. Spota had a limited "reservation" to pursue past

19

damages from ShieldMark up to December 16, 2021. Spota had no right to sue for on-going damages or injunctive relief and has conceded as much. Appx1693.

The argument that Spota retained standing based on nominal title to the patent and control over this litigation is myopic. This Court has been clear that standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on contractual arrangements among the parties regarding who may sue. Possession of a right to sue a single party is not the substantial rights needed to enforce a patent. *See Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 979 (Fed. Cir. 2005). Simply put, Spota retained no exclusionary right in the '664 patent.

Whether a party retained substantial interests in a patent, i.e. statutory standing, focuses on two salient rights: enforcement and alienation. A hunting license, as described above, does not equate to a right to enforce. Additionally, Insite DE has the right to license the '664 patent rendering the right to enforce nugatory. *Lone Star*, 925 F.3d at 1231; *see Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000) (explaining that the right to sue is "illusory" when one party "can render that right nugatory by granting the alleged infringer a royalty-free sublicense").

Spota also relinquished the right to alienate. In accordance with the License, Spota "… shall not at any time assign or transfer to any third party any ownership right or interest in or to … [the '664 patent] or any claims of infringement…."

Appx1809-1810 at §2.2. InSite DE was free to license any third party without limits or restrictions, including ShieldMark past December 16, 2021. Neither Lowe nor Spota can veto any such grant to practice the patent or otherwise restrict the scope of the grant.

Lowe and Spota argue that they have the implied rights to continue to practice the patent and to license the patent. Such claimed rights are illusory.  In the transaction with InSite DE, Lowe, on behalf of himself and his company, agreed that he and his company would not manufacture or sell floor markers or floor tape. Appx2812 at §2(a).  The Restrictive Covenant Agreement provided for further restrictions to protect the business investment of Insite DE. *Id.* at §2(b)-(g). And Lowe agreed that his company would not assign or transfer any right or interest in the '664 patent. Appx1809-1810 at §2.2. Those restrictions eradicated any right to practice the '664 patent or to license any third party to practice the patent.

### C.    The broader context confirms the lack of standing

The Assignment and the License must be examined in the context of a broader transaction in which Lowe and InSite NC effectively sold the business. Neither Lowe nor Insite NC intended to continue in business or practice the '664 patent. All the assets for the business were sold. Lowe entered into a restrictive covenant precluding him and his company from manufacturing or selling floor markers or floor tape and agreed to further restrictions to protect the investment of Insite DE.

Clearly, the intent of the parties was to transfer the rights in all the assets to Insite DE and for Lowe and Insite NC simply to retain a hunting license to continue this litigation.

As of December 16, 2021, neither Lowe nor InSite NC had a right to (1) practice the patent; (2) license the patent; (3) sue for any current or future infringement of the patent; (4) forgive current or future infringement of the patent; (5) supervise, veto or restrict InSite DE from licensing the patent post-closing; (6) share in any license fees; (7) assign the patent to a third party. As of December 16, 2021, InSite NC had a mere hunting license to pursue past damages against ShieldMark.

## D.    A hunting license does not equate to standing

Allowing Lowe or Spota to continue this litigation to pursue a limited damage recovery contradicts the very policy underlying this Court's substantial rights test -- the danger of multiple litigations against the same defendant by multiple plaintiffs. *See Prima Tek II,* 222 F.3d at 1381 ("[A] 'right to sue' clause cannot confer standing on a bare licensee ... To hold otherwise would allow a patent owner to effectively grant a 'hunting license,' solely for the purpose of litigation, in the form of a *pro forma* exclusive license ... The Supreme Court long ago disapproved of such arrangements."); *see also Crown Die & Tool*, 261 U.S. at 40.

The Court's policy is not some judicial gloss on standing. Rather, that policy is rooted in the standing doctrine that requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) *that is likely to be redressed by a favorable judicial decision*." *Spokeo*, 578 U.S. at 338 (emphasis added). The injury in fact must be "concrete and particularized" and "actual or imminent," not merely "conjectural or hypothetical." *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). And, that injury must be fully redressable by a judicial decision. "If a plaintiff fails at any step, the court cannot reach the merits of the dispute." *U.S. v. Texas*, ___ U.S. ___, 143 S. Ct. 1964, 1976 (2023) (Gorsuch, J. concurring).

What must the judicial decision address? Whether the exclusive rights of the patent been infringed and whether that infringement been remedied – giving *complete and final* relief to the owner of the substantial rights in the patent and clarity to the patent owner, the alleged infringer, and the market. The patent laws not only protect the exclusive rights of the patent owner but also encourage the inventiveness and creativity for the market. Clearly delineating the limits of exclusive rights and redressing infringement encourages competition and creativity outside those boundaries. If the infringement is not fully addressed, then neither the patent owner nor the alleged infringer has any final resolution. Therefore, standing cannot be premised on some reservation of a claim for past damages but must

23

provide a remedy providing finality and clarity to the scope of the alleged infringement through trial.

Consider the consequences if standing is recognized in this case. Would infringement be finally resolved? Neither Lowe nor Spota has any substantial interest in the '664 patent. Neither has any interest in vindicating the patented technology. (Note that neither has any on-going obligation to defend the patent). Lowe and Spota have only a hunting license for limited monetary damages. Would this trial bring finality to the alleged infringement? The answer is obvious. ShieldMark, Advanced Plastics and Crown Corp. face the real prospect of another patent infringement claim from a third party claiming damages post-December 16, 2021. This piece-meal litigation is exactly the reason for this Court's standing doctrine that plaintiffs like Lowe and Spota cannot be understood to have a right to any judicial relief.

### E.    The claim for patent infringement is moot

Standing is not static. "[A]n 'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." *Already, LLC*, 568 U.S. at 90–91 (citation omitted); *Arizonans for Off. Eng. v. Arizona,* 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed'" (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975))). "A

case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC*, 568 U.S. at 91 (quoting *Murphy v. Hunt,* 455 U.S. 478, 481 (1982) (*per curiam*)). No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute "is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already, LLC*, 568 U.S. at 91 (quoting *Alvarez,* 558 U.S. at 93).

"The mootness doctrine ensures compliance with Article III's case and controversy requirement by 'limit[ing] federal courts to deciding actual, ongoing controversies.'" *Aref v. Lynch*, 833 F.3d 242, 250 (D.C. Cir. 2016) (alteration in original) (quoting *Am. Bar Ass'n v. F.T.C.*, 636 F.3d 641, 645 (D.C. Cir. 2011)). "A plaintiff's failure to satisfy that Article III prerequisite deprives the federal court of jurisdiction to act in the case." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 530 (D.C. Cir. 2019) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998)). Here neither Lowe nor Spota has a current, ongoing case or controversy.

The ability to grant full and complete relief alone implicates the ongoing jurisdiction of the court. As Justice Amy Barrett suggested: "… 'the redressability requirement of Article III itself establishes a tie between jurisdiction and remedies,

25

because a court's inability to order effective relief deprives it of jurisdiction to decide the merits of a question otherwise within its competence.' *See*, *e.g.*, *California v. Texas*, ___ U.S. ___, 141 S. Ct. 2104, 2115 (2021) (redressability "consider[s] the relationship between 'the judicial relief requested' and the 'injury' suffered")" *Biden v. Texas*, ___ U.S. ___, 142 S. Ct. 2528, 2561 (2022) (Barrett, J dissenting).

Lowe and Spota have precluded the district court from entering a judgment that finally and completely resolves the "case or controversy" of patent infringement. The district court could not finally and completely adjudicate the rights and responsibilities of the parties with respect to the '664 patent through trial. This emasculation of a court's authority to determine a "case or controversy" is precisely why a court must monitor standing throughout the course of a lawsuit. This emasculation of authority is also the reason why the district court dismissed the patent infringement claim for lack of standing.

### F.   The addition of InSite DE could not have restored standing

Could the addition of InSite DE have restored standing to Spota? The district court concluded that "both Plaintiffs lack standing—and pleading different facts will not change that result." Appx14. The court explained that its conclusion flowed from the "… analysis of the underlying patent ownership documents." *Id.* Because InSite DE was a third-party nonexclusive licensee, any amendment

to include InSite DE "would not cure the standing defect." Appx14-15 (citing *Sicom Sys., Ltd.*, 427 F.3d at 976. Therefore, the district court dismissed the patent infringement claim with prejudice.

Lowe and Spota argue that the agreements assigned InSite DE "all substantial rights" in the '664 patent, making Insite DE the "virtual patentee" with standing to sue. Dkt.23 at 37. Lowe and Spota did not seek to add InSite DE as a party in the proceedings below – on the contrary, Lowe and Spota strenuously argued that InSite DE is a non-exclusive licensee and, as such, could not be added as a party. Appx2697-2698, Appx2704-2705, Appx2707-2708. Regardless, InSite DE does not have substantial rights in the '664 patent.

An examination of the agreements provides the answer. But first, begin with the difference between an assignment and a license. To create an assignment, a contract must transfer: (1) the entire exclusive patent right, (2) an undivided interest in the patent rights, or (3) the entire exclusive right within any geographical region of the United States. *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891). An agreement that does not transfer one of these three interests is merely a license. *Id.*

Now, turning to the agreements, what was and what was not transferred to InSite DE? First, InSite NC granted to InSite DE a "royalty-free, fully paid-up, perpetual, irrevocable, and non-terminable license … to practice any methods or systems described in or claimed by the …" '664 patent. Appx1809 at §2.1.

Second, InSite NC granted InSite DE the exclusive option to acquire "all right, title and interest in and to the ..." '664 patent. Appx1809-1810 at §2.2. The words "all rights, title and interest" describe the entirety of rights in a patent. *Mynette Technologies, Inc. v. U.S.,* 139 Fed. Cl. 336, 343 (2018). Consequently, InSite DE did not immediately possess or obtain either title to or the entirety of the rights in the '664 patent. Third, as Lowe has acknowledged, InSite DE has no right to enforce the '664 patent. InSite DE can obtain that right, if at all, only by exercising the option to acquire the '664 patent after this lawsuit has been resolved. Appx1809 at §§1.3, 2.1. Fourth, InSite DE currently has no right to collect past, present or future damages for any infringement of the '664 patent. Fifth, InSite DE is not responsible for preserving or defending the '664 patent. Based on this review of the agreements, this Court must conclude that InSite NC did not transfer to InSite DE (1) the entire exclusive patent right, (2) an undivided interest in the patent rights, or (3) the entire exclusive right within any geographical region of the United States. InSite DE, therefore, has a non-exclusive license. In the words of this Court, "[a] nonexclusive license confers no constitutional standing on the licensee to ...even ... join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement." *Sicom Sys*., 427 F.3d at 976.

So where are the substantial rights in the '664 patent? They are in a state of suspension. InSite NC wanted to sell its business related to the '664 patent

but did not want to give up its claim for patent infringement. Insite DE wanted to acquire InSite NC's business but did not want to be involved in the lawsuit. At the same time, Insite DE did not want InSite NC to create a competitor by conferring rights under the '664 patent to ShieldMark going forward. InSite NC's and InSite DE's "solution" was for InSite NC to transfer its business to InSite DE, including the right to use and sublicense the '664 patent; for InSite NC to keep a hunting license only with respect to ShieldMark's past activities; and for InSite NC to give InSite DE a conditional option to acquire the '664 patent after the lawsuit is concluded. Unfortunately for Lowe and Spota/InSite NC, this gambit relinquished standing, and the lack of standing cannot be cured by adding InSite DE to the lawsuit.

Equally, InSite DE presumably conducted a thorough due diligence of the company before buying the floor marking business. With the counsel of its competent lawyers, InSite DE was aware of the risks associated with the current patent infringement litigation as well as the possible outcomes. Thoroughly advised of the risks and the rewards, InSite DE made the informed decision to disclaim any interest in participating in this litigation and that it had any interest that would be impaired, either practically or legally, without its participation. The company effectively structured the transaction to assure that it would not be dragged into the case. The agreements limited any recovery to past damages and

precluded Lowe and Spota from making any claim for future damages. The agreements postponed the option to purchase the title to the '664 patent until the final resolution of the case. With the filing of the Fourth Amended Complaint omitting InSite DE, Lowe and Spota conceded that InSite DE had no interest in or needed to be a party to the case.

## IV.   THE '664 PATENT IS INVALID AND THE DISTRICT COURT COULD GRANT SUMMARY JUDGMENT OF INVALIDITY

The dismissal of Lowe's patent infringement claim did not deprive the district court of the authority to adjudicate the validity of the '664 patent. ShieldMark asserted a compulsory counterclaim for declaratory judgment that the '664 patent is invalid. Appx1294-1315. Contrary to Lowe's argument (Dkt.23 at 37-38) the invalidity counterclaim was not dependent on the determination of Lowe's standing because Lowe's infringement claim could be resumed in this or a subsequent action. See *Altvater v. Freeman*, 319 U.S. 359, 362-64 (1943). The factual predicate for Lowe's infringement claim still exists -- ShieldMark continues to make, use, offer for sale, and sell the accused MightyLine® floor tape -- and Lowe still contends that ShieldMark infringes the '664 patent. Additionally, Spota can renegotiate its agreement with Insite DE to reacquire substantial rights in the '664 patent. InSite DE can exercise the option to acquire the patent and resume the infringement claim against ShieldMark. Under either scenario, the infringement claim could be renewed.

30

"A party seeking a declaratory judgment of invalidity presents a claim independent of the patentee's charge of infringement." *Cardinal Chem. Co. v. Morton Int'l., Inc.,* 508 U.S. 83, 96 (1993). "The sole requirement for jurisdiction under the [Declaratory Judgment] Act [28 U.S.C. §2201] is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act." *Id*. at 96 (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 734-35 (Fed. Cir. 1988)). "'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273 (1941)). This means that the parties' dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests," it must be "real and substantial," and it must be amenable to "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (citation omitted). This Court has applied the *MedImmune* test and held that where a patent has been asserted against ongoing activity and the accused party contends it has the right to engage in that activity without a license, an Article III case or controversy will arise. *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007).

ShieldMark still faces the real and immediate prospect of a claim of infringement for its continuing production of Mighty Line® tape or a similar tape. Lowe maintains his belief that ShieldMark infringes. Lowe meticulously forged a sale of his business but carved from it the scheme to continue this litigation. While others might reasonably move on, he has stubbornly clung to his claim of infringement, even limiting his own recovery. If the sizeable consideration would not encourage the abandonment of the claim, ShieldMark faces the real prospect of future claims being clawed back. "If … a party has actually been charged with infringement of the patent, there is, ***necessarily***, a case or controversy adequate to support jurisdiction of a complaint, or a counterclaim, under the Act." *Cardinal Chem.*, 508 U.S. at 95 (emphasis added).[4]

## A.    Standard of Review

This Court reviews the district court's grant of summary judgment under the law of the regional circuit, here the Sixth Circuit, which reviews such issues de novo. *Junker v. Med. Components, Inc.*, 25 F.4th 1027, 1032 (Fed. Cir. 2022). The Court reviews a district court's factual findings of anticipation for clear error. *Minnesota*

---

[4] Of course, ShieldMark's invalidity counterclaim would be viable if this Court were to find that Lowe and/or Spota has standing to assert the '664 patent against ShieldMark. In that event, this Court can and should address validity of the '664 patent in this appeal because that issue was fully developed in and addressed by the district court, and has been briefed by the parties on appeal. See *Glaxo Grp. Ltd.*, 153 F.3d at 1371-72.

*Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.,* 976 F.2d 1559, 1565

(Fed. Cir. 1992).

**B.    The asserted claims of the '664 patent are anticipated by the Dorenbusch patent**

In support of its declaratory judgment counterclaim, ShieldMark asserted that

the '664 patent is anticipated by the prior-art Dorenbusch patent. Appx1307-1311.

Dorenbusch was not considered by the Examiner during prosecution of the '664

patent. Appx1199-1200. Following remand from this Court reversing the district

court's claim constructions, ShieldMark renewed its prior motion for summary

judgment, arguing that if Lowe's claim constructions are applied, the '664 patent

was anticipated by Dorenbusch. Appx1343, Appx1347-1351. ShieldMark supported

its motion with the Dorenbusch patent, the declaration of Timothy Jensen, who is

skilled in the art of adhesive tapes, and a chart demonstrating how Dorenbusch

discloses each element of the asserted claims of the '664 patent. Appx1535-1579.

In response, Lowe did not deny that Dorenbusch discloses most of the

elements of the asserted '664 patent claims. He only asserted that the upper surface

of the lateral edges in the Dorenbusch spot markers is not an "extension" of the upper

surface of a tape body, which is in independent claim 1 of the '664 patent, and its

dependents, and that the Dorenbusch tape does not "limit[] unintentional lifting" of

the tape from the floor, which is in independent claim 11 and its dependents.

Appx1676-1677.

### 1.    Dorenbusch discloses the "extension" claim element

Claim 1 of the '664 patent and its dependents are directed to the combination of "[a] floor marking tape adhered to a floor wherein the floor marking tape establishes a boundary on the floor." Appx1204 at col. 5:2-4. The tape has a "body that has an upper surface and a lower surface." *Id.* at col. 5:8-9. The body of the tape has "first and second lateral edge portions disposed in the longitudinal direction" with "each of the first and second lateral edge portions having an upper surface and a lower surface." *Id.* at col. 5:16-19. The upper surface of each lateral edge portion of the tape body comprises "an ***extension*** of the upper surface of the body." *Id.* at col. 5:23-24.

Dorenbusch is directed to a rearrangeable marking system for marking a defined area on a hard floor or ground surface. Appx321 at col. 1:50-51. The system comprises spot markers made of a synthetic polymeric material. Each spot marker has a substantially flat low profile with all peripheral edges beveled downwardly. The spot markers are pliable and have a non-slip bottom surface so they remain in place when in use. The spot markers can be lifted and rearranged when desired. *Id.* at col. 1: 52-59. Figure 4 in Dorenbusch is a side elevational view of a spot marker:



FIG. 4

The body of the spot marker (11) has a low profile, and lateral edge portions (13) are beveled. Appx319.

Lowe argues that the upper surfaces of the lateral edges of the Dorenbusch spot markers are not "extensions" of the upper surface of the body but, instead, are "sharply cut and are separate and distinct from the top surface" of the tape. Dkt.23 at 40. This argument contradicts the construction of "extension" that Lowe used in his validity contentions (and ShieldMark didn't dispute), which is merely "a lengthening." Appx1011. As shown in Figure 4 in Dorenbusch above, each lateral edge portion (13) in Dorenbusch lengthens the upper surface of the body (11).

Moreover, Lowe's reliance on purported degree of "sharpness" of the edges in Figure 4 is improper, because the figure is not dimensioned or scaled. See *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000).

Lowe's position that the edges in the Dorenbusch spot markers are too sharp to qualify as "extensions of the top surface" is inconsistent with his infringement argument that ShieldMark's accused Mighty Line® tape meets this requirement. Dorenbusch states that the angle of the lateral edges can be "about 30 degrees."

35

Appx321 at col. 2:62-65. Lowe's own expert, Dr. James Frankland, measured the lateral edges of the Mighty Line® tape to be 29 degrees, i.e., "about 30 degrees." Appx2907. If the 29-degree lateral edges in the accused Mighty Line® tape are "extensions," so are the 30-degree lateral edges in Dorenbusch and, accordingly, Dorenbusch anticipates claim 1 of the '664 patent and its dependents. *See Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889) ("That which infringes, if later, would anticipate, if earlier.").

Lowe argues that "[i]n Dorenbusch, there are four separate and distinct surfaces – a top, bottom and two separate and distinct side surfaces that are not extensions of the top surface" and, as a result, Dorenbusch lacks a "smooth transition at the edge" that "is required for sliding or dragging pallets, skids, and the like across a factory floor as with the invention of the '664 Patent." Dkt.23 at 40-41. Lowe relies exclusively on his self-serving declaration that consists of broad, conclusory assertions about what he wants Dorenbusch to disclose instead of what Dorenbusch actually discloses. Dorenbusch says nothing about "four separate and distinct surfaces." On the contrary, Dorenbusch discloses a "smooth transition," and states that the spot markers have a "substantially flat profile" with edges that are "beveled downwardly" to create a "gently rising area" so that the tape will be "noninterfering." Appx321 at col. 1:53-54 and col. 2:60-62.

36

### 2. Dorenbusch discloses the "limits unintentional lifting" claim element

Claim 11 of the '664 patent and its dependents require the lateral edge portions of the tape body have "first and second junctions disposed on the uppermost surface of the floor such that the floor marking tape limits unintentional lifting of the floor marking tape from the floor." Appx1204 at col. 6:29-32. Lowe argues that the Dorenbusch spot markers fail to meet this requirement because the tape is used for "temporarily marking a surface" and can be "readily lifted from the surface" whereas "limits unintentional lifting" means that the tape "is neither temporary nor rearrangeable." Dkt.23 at 41.

In the claim construction proceedings, Lowe did not argue that "limits unintentional lifting" means non-temporary or non-rearrangeable. Instead, Lowe argued that "limits unintentional lifting" means that the tape limits, but does not entirely prevent, lifting. Appx2880-2881, Appx2895. The district court adopted that construction (Appx1082-1083), which was not appealed.

Lowe's assertion that "limits unintentional lifting" means non-temporary or non-rearrangeable is inconsistent with the intrinsic record of the '664 patent. The reference to "***un***intentional" lifting in claim 11 indicates that the invention does not exclude intentional lifting. The specification confirms this, stating that "[t]ape lines are desirable because they ***can be lifted when a space is reconfigured*** with [*sic*, without] excessive damage to the floor" and that "the invention provides a floor

37

marking tape having a beveled edge to limit the ***unintentional*** lifting and delamination of the tape from the floor." Appx1202 at col. 1:25-27 and col. 1:47-49.

That is precisely what Dorenbusch teaches. The Dorenbusch spot markers are put down for an activity and are not unintentionally dislodged during the activity. The spot markers can be intentionally moved at the end of the activity for a different activity. The Dorenbusch specification states that "[t]he marking system is readily positioned ….as desired, does not interfere with normal play or use, remains in place without being dislodged, and is readily removed when no longer needed." Appx321 at col. 1:44-47. Further, "[t]he spot markers are pliable and have a non-slip bottom surface which resists lateral forces to remain in place during use, yet are readily lifted from the surface when no longer needed." *Id.* at col. 1:55-58. The specification also states that the spot markers should have a thickness of at least about 100 mils to about 300 mils so they have "sufficient bulk or weight to remain in place once properly positioned," *Id.* at col. 2:56-60, and that "a thin layer of adhesive can be applied to the underside of each spot marker" to keep it in place until the spot marker is intentionally removed from a surface. Appx322 at col. 3:15-20.

### 3. Lowe's new argument that Dorenbusch fails to disclose a tape that is "secured" to the floor should be rejected

Lowe argues that Dorenbusch does not anticipate the '664 patent claims because the claims require that the tape is "secured" to the floor and the Dorenbusch spot markers supposedly are not. Lowe did not make this argument below and,

38

therefore, it is waived on appeal. See *Fresenius USA, Inc. v Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal, and we do so here."). Regardless, Lowe's argument lacks merit.

All the asserted claims of the '664 patent require "an adhesive securing the lower surface of the [tape] body to the uppermost surface of the floor to establish a boundary." Appx1204 at col. 5:35-36 and col. 6:35-36. As stated above, Dorenbusch teaches that an "adhesive" can be applied to the underside of the spot markers to keep them in place during use. Appx322 at col. 3:15-20. This meets the requirement of an "adhesive" that "secur[es] the lower surface of a tape body to the surface of a floor." Lowe acknowledges that Dorenbusch discloses the application of an "adhesive" to the underside of the spot markers but argues that the "adhesive securing" feature of the '664 patent claims "has nothing to do" with the use of "adhesive" in Dorenbusch because that use is for lateral (non-slip) forces whereas the "adhesive securing" feature of the '664 patent claims is for "vertical lifting and separating forces." Dkt. 23 at 39. Lowe cites no authority for this argument, and nothing in the evidentiary record supports him. The '664 patent claims say nothing about the "adhesive securing" being confined to "vertical lifting and separating forces." Lowe is improperly reading that limitation into the claims. Regardless,

39

skidding pallets, skid, or the like over a tape, which the patented tape can purportedly withstand (see, e.g., Appx1202 at col. 1:28-30 and 49-51),involve lateral (non-slip) forces.

Lowe argues that Dorenbusch "teaches away from the invention of the '664 Patent" because "if the adhesive in Dorenbusch was selected to secure the spot markers in the same manner as the tape of the claimed invention, Dorenbusch would be rendered unsuited for its intended purpose." Dkt. 23 at 39-40. But "teaching away" is irrelevant to anticipation, *Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998), and a comparison between the purpose of the '664 patent and the purpose of the Dorenbusch patent cannot avoid anticipation. *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1356 (Fed. Cir. 2008). *See also Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988) (stating that it is the "claims, not the specifications" that are anticipated). The '664 patent claims only require an "adhesive securing the lower surface of the [tape] body to the uppermost surface of the floor." Appx1204 at col. 5:35-36 and col. 6:35-36. Dorenbusch expressly teaches the use of an "adhesive" that attaches the lower surface of spot markers to the uppermost surface of a floor so the spot markers

remain in place during use (see Appx322 at col. 3:15-20), and that suffices for anticipation.[5]

Because the undisputed evidentiary record establishes that Dorenbusch discloses each element of the asserted claims of the '664 patent, the district court's grant of summary judgment that the '664 patent is invalid as anticipated by Dorenbusch should be affirmed.

## C.   The '664 patent is invalid as anticipated by the prior art DuraStripe floor tape

In addition to Dorenbusch, ShieldMark asserted that the '664 patent is invalid as anticipated by the prior-art DuraStripe floor tape. Appx1343-1347. The district court did not address DuraStripe in its summary judgment decision. Because anticipation based on DuraStripe was fully presented to the district court, this Court can address the issue and affirm summary judgment of invalidity based on DuraStripe. See *Glaxo Grp. Ltd.*, 153 F.3d at 1371-72.

ShieldMark identified DuraStripe floor tape as anticipatory prior art in its invalidity counterclaim. Appx1296-1303. The DuraStripe product shown and described in ShieldMark's counterclaim is indisputably prior art to the '664 patent

---

[5] To the extent Lowe is arguing that the '664 patent claims require the use of a particular type of "adhesive," that argument was waived on appeal because Lowe offered no such construction in the district court. Instead, Lowe agreed with ShieldMark that the phrase, "adhesive securing the lower surface of the body to the uppermost surface of the floor" was not in dispute and, therefore, did not need to be construed. See Appx1366, Appx1369.

because it was on sale and in public use more than one year before April 22, 2005, the earliest priority date of the '664 patent. Appx2119-2129, Appx2131-2137. In fact, DuraStripe and the accused Mighty Line® floor tape are materially the same product. ShieldMark marketed and sold DuraStripe from October 2002 until March 2006, when the name of the product was changed to MightyLine®. Appx911-916.

In its motion for summary judgment, ShieldMark submitted the declaration of Timothy Jensen with a chart demonstrating how the prior-art DuraStripe tape discloses each element of the asserted claims of the '664 patent. Appx1343-1347, Appx1372-1496.

In response, Lowe did not address the prior-art DuraStripe sample that was the basis of ShieldMark's motion or dispute that the sample has each element of the asserted claims of the '664 patent. Instead, Lowe argued that **different** alleged DuraStripe samples of unsubstantiated provenance (which Lowe characterized as "bull-nosed" and "duck-billed") lacked the "lateral edge portions" required by the '664 patent claims. Appx1673-1674. Further, Lowe disputed that the "bull-nosed" and "duck-billed" tapes were made from the same die as the accused MightyLine® floor tape. Appx1675.

The sale or public use of even a single product that includes all the elements of a patent claim is sufficient to invalidate a patent under 35 U.S.C. § 102(b). *See In re Caveny*, 761 F.2d 671, 676 (Fed. Cir. 1985). On summary judgment, ShieldMark

came forth with a DuraStripe product that is prior art to the '664 patent under §

102(b), and evidence that that DuraStripe product has each element of the asserted

claims of the '664 patent. Lowe did not dispute the evidence, instead asserting that

different tapes that are allegedly DuraStripe lack the "lateral edge portions" claim

element. Because the undisputed evidentiary record establishes that a DuraStripe

product anticipates the asserted '664 patent claims, this Court can affirm the grant

of summary judgment that the '664 patent is invalid based on prior-art DuraStripe

tape.

## V.    SHIELDMARK'S ADVERTISING WAS MERE PUFFERY

### A.    Standard of Review

This Court reviews the district court's grant of summary judgment under the

law of the regional circuit, here the Sixth Circuit, which reviews such issues de novo.

*Junker v. Med. Components, Inc.*, 25 F.4th 1027, 1032 (Fed. Cir. 2022).

### B.    The false advertising claim

Pled in the alternative to patent infringement, Spota alleged that ShieldMark

made literally false representations of fact in its advertisements for Mighty Line®

floor tape. Appx1183-1198. The false advertising claim was based on ShieldMark's

internet advertising, which was attached as Exhibits 2-4 to the Fourth Amended

Complaint. Appx2923-2931, Appx1206-1219. From these promotions of Mighty

Line® tape, Spota cherry-picked the following phrases as the basis for the false

advertising:

- beveled edges increase durability for forklift traffic
- beveled edge tape can take a beating from industrial wheel traffic
- Mighty Line floor tape withstands industrial brush scrubbers, forklifts, and heavy industrial wheel traffic

Spota argued that these phrases were literally false. ("If ShieldMark's Mighty Line® floor marking tape … does not have beveled edges *that 'increase durability for forklift traffic'* or that *'can take a beating from industrial wheel traffic'* or *cannot withstand[] …, forklifts'* (all representations of fact) then ShieldMark's advertising is literally false.")). Appx2095-2096. However, Spota also conceded that the statement that Mighty Line® tape had "beveled edges" was *true and correct*. *Id*. This admission left only the following phrases as the basis for the false advertising claim: "increase durability"; "can take a beating"; and "withstands."

## C.    The district court found the phrases to be mere puffery

On cross-motions for summary judgment, the district court granted summary judgment to ShieldMark, finding that "take a beating," "durability" and "withstand" are not sufficiently specific or measurably false to be actionable and were not literally false. Appx27-28; Appx29.

## D.    The ads were puffery – not literally false statements of fact

Section 43(a) of the Lanham Act prohibits "[a]ny person [from] ... us[ing] in commerce any…false or misleading description of fact, or false or misleading representation of fact, which…in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her

or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). "Liability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Innovation Ventures, LLC v N.V.E., Inc.,* 694 F.3d 724, 735 (6th Cir. 2012) The former theory focuses on the plain language of the advertisement, while the latter focuses on how the advertisement is perceived by its intended audience. *Id.* at 735. "'[O]nly an unambiguous message can be literally false.'" *Id.* at 737 (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 587 (3d Cir. 2002). "Whether a statement is too ambiguous to be literally false is a matter of law to be decided by the Court." *Louisiana-Pac. Corp. v. James Hardie Bldg. Prod., Inc.,* 335 F. Supp. 3d 1002, 1012 (M.D. Tenn. 2018), *aff'd,* 928 F.3d 514 (6th Cir. 2019).

Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability. *See Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.,* 784 F.2d 674, 685 (5th Cir. 1986); *Groden v. Random House, Inc.,* 61 F.3d 1045, 1051 (2nd Cir. 1995) (citing Restatement (Third) of Unfair Competition § 3 (1993)). "Why? Because reasonable consumers know that marketing involves some level of exaggeration—what the law calls 'puffery.' Courts thus view Lanham Act claims challenging hyperbolic advertising with a skeptical eye." *Wysong Corp. v. APN Inc.*, 889 F.3d 267, 271 (citing *Interactive Prods. Corp. v. a2z Mobile Off.*

*Sols., Inc.*, 326 F.3d 687, 699 (6th Cir. 2003)). Mere puffery is not actionable under the Lanham Act. "Rather the statements at issue must be a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) (citation omitted). As the Fifth Circuit noted*:* "[A] statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification." *Presidio,* 784 F.2d at 679; *see also Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir. 1997) (stating that to constitute a statement of fact, a statement must make "a specific and measurable advertisement claim of product superiority").

Spota based the claim exclusively on a "literally false" theory. Spota argues that each of the cherry-picked phrases from ShieldMark's advertisements unambiguously state the fact that the Mighty Line® tape limits unintentional lifting from the floor. Spota reaches this conclusion by treating the phrases "increase durability," "take a beating," and "withstands" as literal equivalents to "limit[] unintentional lifting of the floor making tape from the floor." Spota's conclusion is based on a false equivalence between the accused phrases and the "unintentional lifting" requirement of the '664 patent.

ShieldMark's advertisements are not subject to specific measurable statements of fact. What is the standard for increasing durability? How is floor

marking tape objectively evaluated for "taking a beating"? What standard measures "withstands"? None of these statements are sufficiently explicit or unambiguous to constitute specific false claims of a literal nature. Rather, these descriptions of the floor marking tape are opinions expressing superiority of the tape. As the advertising touts – the Mighty Line® floor tapes are "the best industrial marking products out there." The district court correctly concluded that the phrases were not literally false statements of fact but were mere puffery.

### E.    Spota has no proof of damages

Without a scintilla of proof of any loss or damages, Spota sought disgorgement of ShieldMark's profits on sales of Mighty Line® tape. Spota argued that once it proved sales, the burden shifted to ShieldMark to prove any offsets to arrive at profits. Appx2217. Such an argument is not the law. The Lanham Act provides that a successful plaintiff "shall be entitled" to recover "any damages sustained." 15 U.S.C. § 1117(a). However, a plaintiff must prove both actual damages and a causal link between defendant's violation and those damages. *See ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 968-69 (D.C. Cir. 1990).

The Sixth Circuit has stated that "literal falsity, without more, is insufficient to support an award of money damages to compensate for marketplace injury." *Balance Dynamics Corp. v Schmitt Indus., Inc.*, 204 F.3d 683, 693 (6th Cir. 2000).

Rather, a plaintiff seeking to recover a disgorgement of profits must present evidence that either the plaintiff suffered a loss or the defendant benefited from that false advertisement. Spota identified absolutely no evidence that it was harmed by the alleged false advertising or that the alleged false advertising produced profits for ShieldMark.[6] This alone dictates summary judgment in favor of ShieldMark. See *IQ Prod. Co. v. Pennzoil Prod. Co.,* 305 F.3d 368, 376 (5th Cir. 2002).

## VI.   JUDGE GWIN DISPLAYED NO BIAS OR PREJUDICE IN HIS INTRAJUDICIAL BEHAVIOR

### A.   Standard of Review

The Court reviews the district court's denial of a recusal motion according to the law of the regional circuit. *Baldwin Hardware Corp. v. FrankSu Enter. Corp.*, 78 F.3d 550, 556 (Fed. Cir. 1996). The Sixth Circuit reviews a district court's "denial of a motion for recusal for abuse of discretion." *Youn v. Track, Inc.,* 324 F.3d 409, 422 (6th Cir. 2003).

### B.   Principles of recusal

"The primary source of disqualification law … is 28 U.S.C. § 455." Charles G. Geyh, *Judicial Disqualification: An Analysis of Federal Law, Third Edition* (3d

---

[6] In response to ShieldMark's Interrogatory No. 16 requesting "all bases for Plaintiffs' damages claims against ShieldMark …," Lowe stated that he was seeking only damages for patent infringement. Appx2917.

ed. 2020). "Subsections (a) and (b) occupy the core of § 455 and should be read together. The two subsections divide the universe of disqualification into two categories: the general catchall of § 455(a), which requires disqualification from any proceeding in which a judge's 'impartiality might reasonably be questioned'; and a list of more specific grounds for disqualification in § 455(b)." *Id.* As embodied in § 455, subsections (a) and (b) are conceptually separate. Subsection (a) compels disqualification for the appearance of partiality, while subsection (b) "also" compels disqualification for bias, financial interest, and other specific grounds. *Id.* at 14. Any circumstance in which a judge's impartiality might reasonably be questioned under § 455(a) requires disqualification, even if the circumstance is not enumerated in § 455(b). At the same time, when § 455(b) identifies a particular situation requiring disqualification, it will tend to control any § 455(a) analysis with respect to that specific situation. *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 860 n. 8 (1988).

Under 28 U.S.C § 144, disqualification is triggered by an affidavit that alleges "the judge before whom the matter is pending has a personal bias or prejudice either against [the affiant] or in favor of any adverse party." "An affidavit filed under § 144 must 'allege[ ] facts which a reasonable person would believe would indicate a judge has a personal bias against the moving party.'" *Youn*, 324 F.3d at 423 (quoting *Gen. Aviation, Inc. v. Cessna Aircraft, Co.,* 915 F.2d 1038, 1043 (6th Cir. 1990)).

That alleged bias must "stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *U.S. v. Grinnell Corp.,* 384 U.S. 563, 583 (1966). The Sixth Circuit has explained that "[e]xtrajudicial conduct encompasses only personal bias as distinguished from a judicial one, arising out of the judge's background and association and not from the judge's view of the law. *Youn*, 324 F.3d at 1043. (internal quotation marks omitted). "'Personal' bias is prejudice that emanates from some source other than participation in the proceedings or prior contact with related cases." *Id.*.

The Sixth Circuit has further explained, "[i]t is well settled that sections 144 and 455 'must be construed *in pari materia*' and 'that disqualification under section 455(a) must be predicated as previously under section 144, upon extrajudicial conduct rather than on judicial conduct.'" *U.S. v. Story,* 716 F.2d 1088, 1091 (6th Cir. 1983) (quoting *City of Cleveland v. Krupansky,* 619 F.2d 576, 578 (6th Cir. 1980)). In *Liteky v. United States*, 510 U.S. 540, 548 (1994) the Supreme Court noted that the standard for bias or prejudice under §144 is identical to disqualification for bias and prejudice under § 455(b)(1).

"Case law has articulated several interpretative guidelines for judicial recusal." *Andreade v Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003). One maxim is that the standard for bias is not "subjective," but, rather, "objective." *See U.S. v.*

*Ayala,* 289 F.3d 16, 27 (1st Cir. 2002) ("[D]isqualification is appropriate when 'the facts asserted provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality.'"). The Sixth Circuit has held that the § 455(a) standard is objective: "hence, the judge need not recuse himself based on the 'subjective view of a party' no matter how strongly that view is held." *U.S. v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990) (citing *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988), *cert. denied*, 488 U.S. 1018 (1989)).

"Another maxim is that review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents." *Andreade*, 338 F.3d at 455.

"Finally, the origin of a judge's alleged bias is of critical importance." *Andreade*, at 455. The Supreme Court applied a common-law doctrine commonly called the "extrajudicial source rule" to the interpretation of § 455. *Liteky,* 510 U.S. at 555. As articulated by the Supreme Court, this rule more or less divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal.

The Supreme Court specified judicial conduct which would rarely be grounds for disqualification under 28 U.S.C. § 455(a) (and by extension 28 U.S.C § 144). Each example reaffirms that the bias or prejudice must stem from extrajudicial

51

conduct. "First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky,* 510 U.S. at 555. "Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* For example, off-the-record insults and expressions of distaste for several parties did not reveal such a high degree of favoritism or antagonism as to make fair judgment impossible because "expressions of impatience, dissatisfaction, annoyance, and even anger" will not establish the basis for bias or prejudice required by 28 U.S.C. § 455. *Andreade*, 338 F.3d at 462. Additionally, "[a] judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky*, 510 U.S. at 556; *see also U.S. v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1981) ("A bias sufficient to justify recusal must be a personal bias as distinguished from a judicial one, arising out of the judge's background and association and not from the judge's view of the law.")

### C.    Lowe's motion to recuse Judge Gwin

Lowe moved to recuse Judge Gwin under 28 U.S.C.§§144, 455(a) and 455(b).

His success depends upon his ability to clear the foregoing hurdles. He must (1) demonstrate that the alleged comment, action, or circumstance was of "extrajudicial" origin, (2) place the offending event into the context of the entire trial, and (3) do so by an "objective" observer's standard. Moreover, he must demonstrate that the district court's refusal to recuse was not merely erroneous, but, rather, an abuse of discretion. *Andreade*, 338 F.3d at 462. It is hardly surprising that he failed to clear them.

### D.    Judge Gwin's alleged intrajudicial bias

Lowe does not accuse Judge Gwin of any extrajudicial personal hostility or impartiality or any act specified under §455(b). Rather, Lowe's accusations can be generalized into two categories: (1) remarks during these proceedings; (2) rulings during these proceedings. In neither category had Judge Gwin expressed any deep-seeded prejudice or bias giving rise to any objective basis to warrant recusal.

### 1.    Judge Gwin's intrajudicial remarks

Judge Gwin's comments directed toward the decision of this Court reversing the claim construction reflect nothing more than his, and ShieldMarks' (honestly), disappointment with the ruling and the struggle to find consistency with prior decisions. That reaction did not alter his duty to apply the law. And Judge Gwin did exactly that, comply with the mandate, in subsequent decisions.

Judge Gwin's observation that "all flat marking tapes have edges" does not

betray a bias or prejudice but a simple observation of a fact – a tape, any type, is only so wide. The tape does not go on *ad infinitum*. Opinions held by judges based on what they learned in earlier proceedings are not subject to deprecatory characterization as "bias" or "prejudice. *See In re Triple S Restaurants, Inc.*, 422 F.3d 405, 417 (6th Cir. 2005). A statement of fact does not betray any such favoritism or antagonism.

Similarly, Judge Gwin's misunderstanding that a motion for substitution of an expert witness was fully briefed reflects nothing more than the mistaken impression of a busy district court judge. Again, Judge Gwin corrected that mistake and accorded Lowe the opportunity to file an opposition to that motion. Appx2921-2922.

Finally, Lowe resurrects the *Markman* hearing and complains that Judge Gwin inquired if the claims of the patent were means plus function claims. The court's questions, Judge Gwin explained, "… came from the '664 patent itself. *** Although the parties did not claim the patent as a means-plus-function patent, the patent claims gave some implication that they might be in means-plus-function format." Appx2.  Again, this would be nothing more than an inquiry of a district judge attempting to understand the claims to be construed. Lowe, however, infers a nefarious motive.

### 2.    Judge Gwin's intrajudicial rulings

Lowe's alternative claim of judicial bias implicate judicial rulings in the case. It is settled that "judicial rulings alone almost never constitute a valid basis for a bias

or partiality motion.... Almost invariably, they are proper grounds for appeal, not for recusal." *Liteky*, 510 U.S. at 555. "Bias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it 'in' for the party for reasons unrelated to the officer's view of the law, erroneous as that view might be." *McLaughlin v. Union Oil Co. of California,* 869 F.2d 1039, 1047 (7th Cir. 1989); This principle is well-established in the Sixth Circuit. *See Woodruff v. Tomlin,* 593 F.2d 33, 44 (6th Cir. 1979) ("Such recusal [under 28 U.S.C. § 455(a) ] cannot be based on decisions or rulings of a judge.").

Lowe infers bias based on Judge Gwin instructing that experts be simultaneously disclosed. He argues that such an order is contrary to the assumption that patents are presumed valid and the respective burdens of proof to invalidate a patent. Judge Gwin's pretrial order did not eradicate any such presumption or change any burden of proof. Local Patent Rule 1.5 expressly authorized the court to "modify the obligations or deadlines set forth in these Local Patent Rules based on the circumstances of any particular case ...."

In the end, Lowe, "the hypersensitive, cynical, and suspicious person," sees prejudice where any well-informed, thoughtful and objective observer would see a busy district court judge diligently controlling his docket and making every effort to dispose of a case based on the law and arguments presented. Judge Gwin correctly denied the motion to recuse.

## VII.  LOWE AND SPOTA ENGAGED IN VEXATIOUS LITIGATION AND SANCTIONABLE CONDUCT WARRANTING AN AWARD OF FEES

"[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* In making the "exceptional case" determination, the Court may properly consider, among other things, "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at n.6 (citation omitted).

### A.    Standard of Review

The Court reviews the district court's finding that a case is "exceptional" under § 285 for clear error. *Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1358 (Fed. Cir. 2010). Once a case is determined to be exceptional, the Court reviews the district court's decision to award attorney fees under an abuse of discretion standard. *Id.*

### B.    The district court's findings of vexatious litigation

Lowe and Spota alleged infringement of an invalid patent, resorted to false allegations to perpetuate a lawsuit in which they lacked standing, made scurrilous

accusations that the trial judge was prejudiced against them, deliberately withheld documents which had been sought in discovery and willfully disclosed ShieldMark's confidential information that had been clearly and conspicuously marked as attorneys' eyes only. Consequently, ShieldMark had to defend a meritless lawsuit for years, retain multiple expert witnesses and file motions to compel the disclosure of facts which Lowe had concealed. The district court found this cumulative litigation conduct to be vexatious. Appx30-43.

### C.    Argument

In *Octane Fitness*, the Supreme Court held that §285 is "patently clear" in imposing "one and only one constraint on district courts' discretion to award attorney's fees in patent litigation: The power is reserved for 'exceptional' cases.'" 572 U.S. at 553. The bar for what constitutes "exceptional" conduct was lowered to conduct that "simply stands out from others" and again that standard was not found in mountains of jurisprudence but in the Webster's Dictionary definition of the word "exceptional." *Id.* Fee awards under §285 mean what they say: (1) the grant of §285 awards are within the trial court's discretion; (2) §285 awards are decided on a preponderance of the evidence standard and not a clear and convincing standard; and (3) any review on appeal is under an abuse of discretion standard, not *de novo*. *Id.* at 557.

While there is no precise formula for determining exceptionality, the district court could consider a variety of factors. "Ultimately, a court should base its exercise of discretion in awarding attorneys' fees on equitable considerations of compensation or deterrence 'which make[ ] it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees.'" *ESIP Series 1, LLC v. Doterra Int'l, LLC*, 2022 WL 656777, at *2 (D. Utah Mar. 4, 2022), (citing *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017) (citation omitted)), reconsideration denied, 2022 WL 17903397 (D. Utah Dec. 23, 2022). "'[T]he aim of §285 is to compensate a defendant for attorneys' fees it should not have been forced to incur.'" *Id*.

Lowe's deception before the PTO (which is discussed in the cross-appeal) metastasized into this litigation. One week after Lowe relinquished all rights in the '664 patent, InSite NC entered into the License as part of a larger asset acquisition with InSite DE. But Lowe, the principal beneficiary of those transactions, resorted to a series of misrepresentations, obfuscations and ultimately flouting his on-going obligation to disclose material information in discovery and an obligation to keep the district court advised of any change in standing. And why would such disclosure be withheld? To continue a claim for patent infringement which could further add to his coffers but at the cost of ShieldMark and the district court.

Six months after the sale of the business and the resulting assignment and license, Lowe filed the Fourth Amended Complaint. Appx1183-1198. Lowe "blatantly misrepresented" (in the words of the district court): "Lowe is the owner of all rights, title and interest in the '664 patent. InSite is an exclusive licensee under the '664 patent engaged in the manufacture, distribution and sales of floor marking tape pursuant to its license and under the name 'Superior Mark.' Lowe and InSite share rights of enforcement and recovery under the '664 patent." Appx1185.

But those misrepresentations were only the beginning of a pattern of obfuscations and dereliction of duty. "Suffice to say that by December 16, 2021, [Lowe and Spota] … knew that Defendants had previously requested production of any documents relating to ownership and licensing of the '664 patent. They knew that back in July 2019, their only responses to … [the] requests for production on ownership had been that there were 'no responsive documents.' [Lowe and Spota] … knew that there now were, in fact, responsive documents. Finally, [Lowe and Spota] … knew that under Fed. R. Civ. P 26(e)(1)(A), they had a duty to supplement their prior discovery responses in a 'timely manner'." Appx37.

Abandoning even a scintilla of responsibility, Lowe "took no initiative to supplement their [discovery] productions" and refused to produce the ownership and license documents when confronted with the lack of production. Lowe did not even concede that they had failed to fulfill their responsibilities under the rules or to the

district court. Instead, Lowe made the disingenuous argument that the license was publicly available, excusing the duty to supplement discovery. Lowe then argued that production was not necessary because the documents were not even relevant to the issue of standing. The district court found both arguments to be frivolous. Appx30-43.

As a result of withholding material information about standing and materially misrepresenting a continuing interest in the '664 patent, Lowe protracted this litigation. ShieldMark incurred additional attorney fees and expert witness costs. The district court incurred additional time ruling on needless and unwarranted motions, even being subjected to a scurrilous allegation of prejudice. Once ShieldMark happened upon Lowe's assignment of the '664 patent, Lowe and Spota continued to resist disclosing the complete transaction, even to the Court. Only a court order compelled the full disclosure of the relinquishment of the exclusionary rights in the '664 patent.

"Section 285 demands a simple discretionary inquiry …" *Octane Fitness*, 572 U.S. at 557. District courts must determine whether a particular case is "exceptional" in a "case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*. Whether a case is "exceptional" or not "is a factual determination," *Forcillo v. Lemond Fitness, Inc.*, 168 F. App'x 429, 430 (Fed. Cir. 2006), and the court must make its discretionary determination by a preponderance of the evidence.

The district court observed the litigation tactics and frivolous arguments of Lowe and Spota, none of which supported a reasonable basis for the false allegations of the Fourth Amended Complaint; the intentional withholding of critical information about the assignment, license and sale of the business; the flouting of clear obligations to supplement discovery responses; and the unabated refusal to even acknowledge any responsibility for such behavior. It is abundantly clear that the standard for awarding attorney fees under §285 is "inherently flexible" and fully committed to the district court's discretion. Having had the opportunity to observe and respond to the vexatious and at times frivolous arguments of Lowe and Spota, the district court was well within its discretion to find that behavior exceptionable and not an abuse of that discretion.

To deter review of the district court's findings, Lowe refers this Court to cases which have no precedence. Lowe argues that where a case is dismissed for lack of subject matter jurisdiction and the remedy sought was a declaratory judgment with a prayer for relief under Section 285, the court lacks subject matter jurisdiction "to decide the defenses." Dkt. 23 at 54. Lowe cites *TruCenter Gate Leasing, Inc. v. Sonoran Gate LLC*, 402 F. Supp.2d 1093 (D. Ariz. 2005). Instead of the ambiguous proposition Lowe posited, that decision simply holds that a court does not have independent jurisdiction over fee request which is simply a remedy sought in

conjunction with the declaratory judgment claims over which the court has no subject matter jurisdiction and not a separate claim under Section 285. *Id.* at 1100. Similarly, reliance upon *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472 (1990) is misplaced. In *Lewis*, the Supreme Court simply stated: "An order vacating the judgment on grounds of mootness would deprive Continental of its claim for attorney's fees under 42 U.S.C. §1988 (assuming, *arguendo,* it would have such a claim), because such fees are available only to a party that "prevails" by winning the relief it seeks." *Id*. at 480.

### D.    The district court's findings of sanctionable conduct

But there is more to this litigation than deception and misrepresentation.  This case is marred with sanctionable conduct. ShieldMark disclosed its highly-sensitive sales and profit information to Lowe and Spota in a supplemental discovery response. ShieldMark designated that financial information "confidential – attorneys' eyes only" consistent with Local Patent Rule 2.2. Lowe and Spota thereafter exposed that information in a public filing on the ECF system. The disclosure prompted ShieldMark to immediately move to seal the information and for sanctions. Appx1752-1764. The district court ordered the filing sealed. The court subsequently found the disclosure sanctionable and awarded fees in accordance with its inherent authority. Appx39-40.

Lowe and Spota argue that the information was not confidential and that the Local Patent Rules do not vest the district court with authority to sanction. The district court rebuffed both arguments. Local Patent Rule 2.2 instructs:

> Pending entry of a protective order, discovery and disclosures deemed confidential by a party shall be produced to the adverse party for the eyes of outside counsel of record only, marked "Attorney's Eyes Only Subject to Protective Order." The discovery and disclosures so marked shall be used solely for purposes of the pending case and shall not be disclosed to the client or any other person.

Appx40.  Clearly, a motion for a protective order is not a prerequisite for the continuing obligation to maintain the confidentiality of the discovery or disclosures under the Local Patent Rules. Consequently, the protracted diatribe setting forth the timetable of exchanges between counsel for the entry of a stipulated protective order is an unnecessary expenditure of judicial resources.

Any time the court's rules are flouted and the court does not redress that violation, its authority is undermined and its ability to enforce its orders and rules weakened.  To avoid that result, the court is given several tools to remedy violations of its orders and rules, including Fed. R. Civ. P. 11 and 37.  And, if these tools do not reach the violation, the court may rely on its inherent power. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 51 (1991). This is necessary "so as to achieve the orderly and expeditious disposition of cases." *Pac. Gas & Elec. Co. v. U.S.,* 82 Fed. Cl. 474, 486 (2008). In this parochial dispute regarding the authority of the district court to

enforce its local patent rules, the district court properly exercised its inherent authority to sanction a violation of those rules.

Finally, Lowe and Spota resort to the classic strategy – when you have no defense, go on the offense. In two pages of irrelevant argument, Lowe argues that ShieldMark was responsible for protracting the litigation. To support this ill-advised defense, Lowe and Spota regale the Court with the history of the proceedings prior to the remand and with which the district court did not even consider in determining that Lowe and Spota protracted this litigation.

## VIII.  LOWE ENGAGED IN INEQUITABLE CONDUCT

### A.    Standard of Review

The Court reviews the district court's decisions regarding inequitable conduct under a two-tier standard; the underlying factual determinations for clear error, but the ultimate decision as to inequitable conduct for an abuse of discretion. *Cargill, Inc. v. Canbra Foods, Ltd.,* 476 F.3d 1359, 1364–65 (Fed. Cir. 2007).

### B.    Lowe failed to make material disclosures

During prosecution of the '664 patent, Lowe filed an IDS citing a "Photograph showing the profiles of two floor tapes; the left-hand tape was on sale in the United States prior to April 2004; the right-hand tape is on sale in 2018." Appx1913-1915. That photograph is shown below:

64



Lowe provided no other information, only the non-descript statement that one was on sale prior to 2004 and the other on sale in 2018. Appx1937 at ¶21.

Lowe had been a distributor of DuraStripe/ MightyLine® tape from 2004 through 2011. His distribution and sale of the tape familiarized him with the product design, composition, attributes and features. Lowe posted comparative advertising on his company's website to highlight the differences between his company's tape and ShieldMark's DuraStripe/ MightyLine® floor marking tape.

Based on the arguments made in this case, Lowe considered DuraStripe to be prior art. With his knowledge and information acquired when selling that tape, Lowe had a responsibility to disclose to the PTO his knowledge of DuraStripe. However,

he failed to do so. And Lowe incriminated himself in responding to discovery , going so far as to falsely claim he made the disclosure of the material information.

In his declaration filed in support of summary judgment and in response to ShieldMark's Requests for Admission No. 26, Lowe stated: "During the course of prosecution of the application of the '664 Patent, … I gave the patent office the photograph … bearing Bates Number ISL 00095 showing the edges of the then ShieldMark MightyLine® tape product on the right and the previous ShieldMark floor marking tape product … under the commercial name DuraStripe on the left." Appx334 at ¶25. But he made no such disclosure that the tapes were MightyLine® and DuraStripe or that the photograph depicted the edges of the tapes to thePTO.

### C.    Argument

Applicants have a duty to disclose to the PTO information which is material to the examination of the application. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1256 (Fed. Cir. 1997). Information is material for the purposes of an inequitable conduct determination if "a reasonable examiner would have considered such [information] important in deciding whether to allow the parent application." *Digital Control Inc. v. Charles Mach. Works,* 437 F.3d 1309, 1314 (Fed. Cir. 2006) (internal citation omitted). "In evaluating materiality this court has consistently referred to the standard set forth in PTO Rule 56." *Purdue Pharma L.P. v. Endo Pharms., Inc.,* 438 F.3d 1123, 1129 (Fed. Cir. 2006).

Lowe withheld material information from the PTO's consideration of his patent application and offered no good faith explanation for his conduct. His repeated misrepresentations to the district court about his disclosures to the PTO betray his intent to deceive the PTO. As this Court has concluded, "a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances." *Critikon,* 120 F.3d at 1257 (citation omitted).

Robert Stoll, a former Commissioner of Patents, has extensive knowledge and experience in the prosecution of patents before the PTO and what patent practitioners must do to comply with the PTO requirements of candor, good-faith, truthful representations, and disclosure in dealing with Examiners. Mr. Stoll has reviewed the prosecution history of the '664 patent before the PTO and admissions made in this case. Mr. Stoll has opined:

> Had Mr. Lowe provided the Patent Examiner with the detail presented to this Court, even the recast representations of the DuraStripe prior art that Mr. Lowe claims he made, the Patent and Trademark Office would not have allowed the '664 Patent.

(Appx1992).

As the evidence presented to the district court established, Lowe withheld material information from the PTO. In sharp contrast, the district court simply observed that Lowe did not hide the existence of the DuraStripe tape. But that conclusion is based only on a photograph of two tapes and the brief disclosure accompanying that photograph, not any material disclosure. Despite repeated instances of blatant misrepresentations made to the district court which betrayed his intent, the district court found no such intent. The district court's conclusions are clearly erroneous.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Standing requires more than a hunting license to sue for past damages. Patent infringement requires a valid patent. False advertising requires a literally false statement of fact. Judicial recusal requires more than cynical suspicions. Litigation requires adherence to accurate pleadings and full disclosure for a fair appraisal of the facts and a just determination. Lowe has none of these prerequisites to sustain his appeal. Therefore, this Court should affirm the lack of standing, the invalidity of the patent, the puffery of the advertising, the impartiality of the trial judge and the vexatious litigation decisions of the trial court.

However, this case has disclosed that Lowe had deliberately withheld material information from and deceived the patent examiner in the prosecution of the '664 patent. Giving due consideration to the admissions made in this case, the trial court

should have found inequitable conduct. That one decision should be reversed and remanded for further proceedings.

Dated:  September 27, 2023        Respectfully submitted,

/s/ James F. McCarthy, III
James F. McCarthy, III
Howard L. Wernow
SAND, SEBOLT & WERNOW CO., LPA
4940 Munson Street, N.W.
Canton, OH 44718
Telephone: (303) 244-1174
james.mccarthy@sswip.com
howard.wernow@sswip.com

David J. Sheikh
LEE SHEIKH & HAAN LLC
125 S. Clark Street, Suite 1175
Chicago, IL 60603
Telephone: (312)982-0070
dsheikh@leesheikh.com

*Counsel for Defendants-Cross-Appellees*
*ShieldMark, Inc., Advanced Plastics, Inc.,*
*Crown Equipment Corporation*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2023-1786, 2023-1871, 2023-1893

**Short Case Caption:** Lowe v. ShieldMark, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 16,398 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 09/27/2023

Signature: /s/James F. McCarthy, III

Name: James F. McCarthy, III